FRANKLIN IRON AND METAL CORPORATION, Appellee,

v.

OHIO PETROLEUM UNDERGROUND STORAGE TANK
RELEASE COMPENSATION BOARD, Appellant.

[Cite as *Franklin Iron & Metal Corp. v. Ohio Petroleum Underground
Storage Tank Release Comp. Bd.* (1996), 117 Ohio App.3d 509.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15904.

Decided Dec. 31, 1996.

*Young & Alexander Co., L.P.A.*, and *Thomas P. Erven*, for appellee.

*Betty D. Montgomery*, Attorney General, and *James J. Leo*, Assistant Attorney General, for appellant.

BROGAN, Presiding Judge.

The present action is before the court on the appeal of the Ohio Petroleum Underground Storage Tank Release Compensation Board from a decision order-

ing the board to issue certificates of coverage to appellee, Franklin Iron and Metal Corporation ("Franklin Iron"). The facts underlying this dispute are not contested, and are as follows. On July 11, 1989, R.C. 3737.91 was enacted and created Ohio's Petroleum Underground Storage Tank Release Financial Assurance Fund. According to the statute, the fund is financed through fees collected from underground storage tank ("UST") owners and operators, supplemental fees assessed on underground storage tanks, interest on money in the fund, and appropriations to the fund from the general revenue fund.

The purpose of the fund is to pay costs of corrective actions and to compensate third parties for bodily injury and property damages caused by accidental release of petroleum from underground storage tanks. R.C. 3737.91(E)(1) and 3737.92(A). The fund operates like an insurance fund, with tank owners and operators being allowed to elect varying deductibles for coverage and being issued certificates of coverage by the board, which was also created by the 1989 legislation. With regard to certificates of coverage, R.C. 3737.91(D) specifically states:

"(1) The board shall issue a certificate of coverage to any responsible person who has complied with both of the following:

"(a) Paid the fee assessed under division (B) or (F) of this section;

"(b) Demonstrated to the board financial responsibility in compliance with the rules adopted by the fire marshal under division (B) of section 3737.882 of the Revised Code for the deductible amount established under division (E) of this section or, when appropriate, the reduced deductible amount established under division (F) of this section. If the responsible person utilizes self-insurance as a financial responsibility mechanism, he shall provide the board with an affidavit in which the responsible party certifies that all documentation submitted to the board is true and accurate.

"The certificate of coverage shall state the amount of coverage to which the responsible party is entitled from the fund pursuant to division (D)(3) of this section and the time period for which the certificate provides that coverage. An issued certificate of coverage is subject to the condition that the holder timely pay any supplemental fee assessed under division (C) of this section during the time that the certificate is in effect.

"(2) The board shall not issue a certificate of coverage to any responsible person who fails to comply with divisions (D)(1)(a) and (b) of this section."

In addition to issuing the certificates of coverage, the board is given other responsibilities by the Revised Code, such as assessing supplemental fees to maintain the financial integrity of the fund, adopting regulations, and authorizing disbursements from the fund to pay claims arising from the accidental release of

petroleum. See R.C. 3737.90 through 3737.92. In the context of the board's regulatory power, R.C. 3737.90 provides as follows:

"(B) The board may:

"(1) In accordance with Chapter 119. of the Revised Code, adopt, amend, and rescind rules establishing procedures for calling special meetings of the board;

"(2) In accordance with Chapter 119. of the Revised Code, adopt, amend, and rescind such other rules as are necessary or appropriate to implement and administer sections 3737.90 to 3737.98 of the Revised Code, including, without limitation, rules for the administration of the petroleum underground storage tank linked deposit program established under sections 3737.95 to 3737.98 of the Revised Code; rules establishing priorities for the payment of claims under section 3737.92 of the Revised Code on the petroleum underground storage tank financial assurance fund created in section 3737.91 of the Revised Code based upon a consideration of the date that a claim is originally filed and the threat posed to human health and the environment by the release to which the claim applies; and rules providing for the payment of any such claims in installments, when appropriate. The rules adopted under division (B)(2) of this section shall be consistent with section 9003 of the 'Resource Conservation and Recovery Act of 1976,' 98 Stat. 3279, 42 U.S.C.A. 6991b, as amended, and regulations adopted under it."

In 1994, the board adopted a regulation that required tanks to be certified as assurable before a certificate of coverage would be issued. Specifically, Ohio Adm.Code 3737–1–04(E)(1) states as follows:

"For all underground storage tanks registered with the fund on or after July 1, 1994, upon receipt of full payment due of the annual fee and any past fees owed, * * * upon demonstration of financial responsibility as required by rule 1301:7–9–05 of the Administrative Code, and upon certification by the responsible person that the underground storage tank is assurable pursuant to the criteria set forth in paragraph (E)(3) of this rule, the director shall issue a certificate of coverage."

The regulation also provided that failure to do a number of things, including demonstration and maintenance of assurability criteria, would result in the nonissuance or revocation of a certificate of coverage. Ohio Adm.Code 3737–1–04(E)(1)(c).

Among the factors set forth in Ohio Adm.Code 3737–1–04(E)(3) are the following:

"The director shall determine that an underground storage tank is an assurable tank system upon certification by the responsible person that, as of the date of certification, the following criteria are met:

"(a) The underground storage tank system meets statutory definitions contained in divisions (P) and (Q) of section 3737.87 of the Revised Code and is used to store or dispense petroleum as that term is defined in division (J) of section 3737.87 of the Revised Code;

"(b) The underground storage tank is in compliance with the closure requirements within rule 1301:7–7–28 of the Administrative Code; and

"(c) The underground storage tank is in compliance with rules 1301:7–9–04, 1301:7–9–06, 1301:7–9–07, 1301:7–9–08, and 1301:7–9–10 of the Administrative Code; and one of the following applies:

"(i) The underground storage tank is intentionally being used to store or dispense petroleum, as that term is defined in division (J) of section 3737.87 of the Revised Code; or

"(ii) The underground storage tank is either temporarily out of service in accordance with the requirements of rule 1301:7–9–12 of the Administrative Code or is temporarily closed in accordance with the requirements of rule 1301:7–9–12 of the Administrative Code.

"(4) The director shall not accept the annual petroleum underground storage tank financial assurance fee required by this rule and shall not issue a certificate of coverage for any particular underground storage tank system until such time as the director deems the information contained in the assurability certification to be complete. The assurability requirements of this rule are ongoing in nature and are criteria for maintaining, as well as acquiring, a valid certificate of coverage."

Based on this regulation, the board required completion of a certification of assurability form, which contained questions eliciting information on the above criteria. The board also indicated on the form that the questions must be answered in order for a certificate of coverage to be issued.

Appellee, Franklin Iron, has three underground storage tanks located at 1939 East First Street in Dayton, Ohio. These tanks were registered with the state fire marshal, and after the adoption of the assurability regulation, Franklin Iron submitted the required fee, fee assessment statements, and affidavit of financial responsibility for the three tanks. However, because Franklin Iron refused to complete the certification of assurability form, certificates of coverage were denied. Upon appeal by Franklin Iron, a hearing officer recommended that the board deny the appeal, and on June 7, 1995, the board voted in favor of issuing an order affirming the denial.

Subsequently, on June 29, 1995, Franklin Iron appealed to the common pleas court. A magistrate ruled in Franklin Iron's favor, finding that the board did not have authority to deny certificates of coverage so long as the statutory criteria

were met. In particular, the magistrate focused on the fact that the administrative rule enacted by the board impermissibly imposed additional criteria for coverage. The board's objections to the magistrate's report were subsequently overruled by the trial judge, who entered a judgment ordering the board to issue the requested certificates of coverage to Franklin Iron.

The board now appeals the judgment of the trial court, and presents the following assignments of error:

"I.   Absent a finding that the administrative rule at hand, O.A.C. 3737–1–04(E)(3) and (4), is in clear conflict with the statute, the rule must be given the full force and effect of law.

"II.   The lower court's decision erroneously requires the Petroleum Underground Storage Tank Release Compensation Board [to] accept fees and issue certificates of coverage for containers when there is no authority to do so and thus the lower court's decision produces an unlawful effect.

"III.   The lower court's decision produces a result which is inconsistent with 42 U.S.C. 6991b, and therefore the lower court's decision produces a result which, in turn, is inconsistent with R.C. 3737.90(B)(2).

"IV.   If portions of the rule are invalid, only those invalid portions should be stricken.   The remaining valid portions should be given the full effect and force of law."

I

In support of its first assignment of error, the board contends that the trial court did not apply the correct legal standard because it failed to find a clear conflict between the administrative rule and the statute.   In this context, the board distinguishes between a "conflict" and a "clear conflict," arguing that the latter standard is much more compelling and was erroneously not applied.   We disagree.   Initially, we note that the standard of appellate review of administrative agency rulings is "to ascertain only if the agency's action is supported by reliable, probative and substantial evidence, and is not contrary to law." *Richard T. Kiko Agency, Inc. v. Ohio Dept. of Commerce, Div. of Real Estate* (1990), 48 Ohio St.3d 74, 77, 549 N.E.2d 509, 513.

Because the present case involves undisputed facts, the sole issue would be whether the board's action in adopting Ohio Adm.Code 3737–1–04 was contrary to law.   In concluding that the board's action was contrary to law, both the trial court and magistrate cited relevant authority as to the purpose and scope of administrative rulemaking.   Also, they both concluded that the board acted outside its delegated authority because Ohio Adm.Code 3737–1–04 conflicted with R.C. 3737.92(B) by impermissibly adding conditions for issuing certifi-

cates of coverage. These conclusions are consistent with pertinent authority, which indicates as a well-established rule in assessing regulations of administrative agencies that "administrative rules, in general, may not add to or subtract from * * * the legislative enactment." (Emphasis omitted.) *Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Ohio Bur. of Emp. Serv.* (1986), 21 Ohio St.3d 5, 10, 21 OBR 269, 273, 487 N.E.2d 288, 292. Thus, in *Cent. Ohio,* the Supreme Court held that if a regulation in the Ohio Administrative Code were construed as permitting only one renewal of a one-year teaching certificate, it would subtract from and, therefore, impermissibly conflict with R.C. 3319.281, which permitted up to three renewals of such certificates. The court further noted that if the regulation were so construed, "it would be rendered a nullity, for it has been held that a rule is invalid where it clearly is in conflict with any statutory provision." *Id.* Under the Supreme Court's standard, then, a regulation that impermissibly adds to or subtracts from a statute automatically creates a clear conflict, invalidating the rule.

Likewise, in *Carroll v. Dept. of Adm. Serv.* (1983), 10 Ohio App.3d 108, 110–111, 10 OBR 132, 133–134, 460 N.E.2d 704, 707, an administrative regulation requiring employees to submit to medical examinations was held invalid as beyond the power delegated to the Director of Administrative Services. The director was given the task of verifying proper use of sick leave, and the enabling statute allowed the director to promulgate regulations to carry out his duties. However, the regulation in question added an impermissible additional requirement. Specifically, while the Revised Code said only that a doctor's excuse might be required to justify the use of sick leave, the regulation required employees to submit to medical exams, and the director was then allowed to place individuals on sick or disability leave if they were found unqualified to remain at work. 10 Ohio App.3d at 109–110, 10 OBR at 132–134, 460 N.E.2d at 706–707. In holding the regulation invalid, the court emphasized that "because the power delegated is to administer rather than to legislate, the director may not promulgate rules which add to his delegated powers, no matter how laudable or sensible the ends sought to be accomplished." 10 Ohio App.3d at 110, 10 OBR at 134, 460 N.E.2d at 707. The *Carroll* decision was specifically cited by the magistrate in his decision, and as we previously noted, the trial court affirmed on the basis that the board's regulation conflicted with the statute by impermissibly adding criteria for participating in the fund.

Given these facts, we do not find reversible error, even though the trial court might better have said, under *Central Ohio,* that the impermissible addition created a clear conflict, instead of merely stating that a conflict existed. Nonetheless, the court's meaning is not confusing, since an impermissible addition to or subtraction from a statute is one means of creating a clear conflict. Another

would be a regulation that intends to clarify but is not a reasonable or supportable interpretation of the statute. *Chicago Pacific Corp. v. Limbach*, (1992), 65 Ohio St.3d 432, 435, 605 N.E.2d 8, 11. Accordingly, we do not find that the trial court applied an incorrect standard, and, therefore, we overrule the first assignment of error.

## II

In the second assignment of error, the board argues that the lower court's decision is unlawful because it requires the board to accept fees and issue certificates of coverage for tanks over which the board has no jurisdiction. In this context, the board argues that questions one, two, and six on the form for certification of assurability are proper because the board is merely asking for information to see if it has jurisdiction over the tanks systems for which fees are being collected.

Initially, we note that R.C. 3737.91(D)(1) says that the board *shall* issue certificates of coverage to any responsible person who has paid the fee and has "demonstrated financial responsibility in compliance with rules adopted by the fire marshal under division (B) of section 3737.882 for the deductible amount established under division (E) of this section." Given the consistently applied rule of statutory construction that the use of the word "shall" is mandatory absent a "clear and unequivocal" legislative intent otherwise, the only conclusion that can be reached is that the board is obligated to issue a certificate of coverage if the statutory criteria are satisfied. *Dorrian v. Scioto Conservancy Dist.* (1971), 27 Ohio St.2d 102, 102–103, 56 O.O.2d 58, 58, 271 N.E.2d 834, 835. The issue then becomes whether the regulation imposes additional criteria for coverage or is merely a means of obtaining necessary information, as the board suggests.

For purposes of assessing the board's argument, some distinctions must be kept in mind. First, R.C. Chapter 3737 deals with three areas: the fire marshal, fire safety, and petroleum underground storage. R.C. 3737.01 contains definitions applicable to the chapter, and defines "responsible person" in division (F) as "the person responsible for compliance with the state fire code." However, the section of R.C. Chapter 3737 dealing with underground storage tanks contains a different definition of responsible person, as follows:

"As used in sections 3737.87 to 3737.98 of the Revised Code:

"\* \* \*

"(N) Notwithstanding division (F) of section 3737.01 of the Revised Code, 'responsible person' means the person who is the owner and operator of an underground storage tank system." R.C. 3737.87(N).

Therefore, the statute specifically defines a responsible person for the board.

R.C. 3737.87(Q) further defines underground tank system as "an underground storage tank and the connected underground piping, underground ancillary equipment, and containment system, if any." In addition, R.C. 3737.87(P) defines underground storage tank as one or more tanks used to store an accumulation of regulated substances, and provides a number of exclusions from the definition. It is the board's position that since the board only has jurisdiction over underground storage tank systems, questions about whether the system meets the statutory definitions are proper and, indeed, necessary so that the board may know if the tank system is within its jurisdiction.

We would be inclined to agree with the board as to this specific information only, except for several factors. First, regulations of the state fire marshal require that underground storage tank systems be registered with the fire marshal's office by July 1 of each year. Ohio Adm.Code 1301.7-0-04. Additional regulations of the fire marshal require that owners and operators of underground storage tank systems obtain and demonstrate financial responsibility for those systems. Included in these financial responsibility requirements are demonstration of financial responsibility in an annual aggregate amount, demonstration of a valid certificate of coverage in the Ohio financial assurance fund, and a demonstration of financial responsibility in a per-occurrence amount of the fund deductible. Ohio Adm.Code 1301:7-9-05(F) and (G).[1] Moreover, under Ohio Adm.Code 1301:7-9-05(BB), owners and operators are released from the financial responsibility requirements if the system has been properly closed. Therefore, the only applicants for coverage under the fund would be parties who are required by the fire marshal to apply, and over whom the board would obviously have jurisdiction. Under the circumstances then, the board's regulation is not necessary for determining jurisdiction over applicants. While this would not, in itself, justify invalidating the regulation, the fact that issuance of a certificate is specifically conditioned on supplying this information creates an impermissible addition to the statutory criteria, which were very clearly and explicitly set forth by the legislature in R.C. 3737.91(D)(1). In other words, we have no difficulty with the board's wish to ask applicants if they are owners or operators of

---

1. The annual aggregate amount for one to one hundred tanks is $1,000,000, and is $2,000,000 for owners or operators of more than one hundred tanks. The fund deductible is $55,000, unless a reduced deductible is purchased for an additional $150 per tank. Responsibility for the fund deductible can be shown in a variety of ways, including demonstration of self-insurance, bonds, letters of credit, guarantees, and insurance. This regulation is the one adopted by the fire marshal for the financial responsibility deductible amount, as referred to in R.C. 3737.91(D)(1)(b) (indicating that certificates of coverage shall issue upon payment of the fee and proof of financial responsibility in compliance with rules adopted by the fire marshal for the deductible amount).

underground storage tank systems. However, conditioning issuance of certificates of coverage on the provision of this information is not appropriate.[2]

In reaching this determination adverse to the board, we wish to make a number of points clear. The ability to promulgate appropriate regulations is rightly within the province of administrative agencies, and we are loath to intervene in that process in light of our limited review power. We also have little sympathy for litigants who could avoid protracted litigation by simply providing information that has already been disclosed to another administrative agency. At the same time, if the legislature intends for the board to supplement the statutory criteria and restrict coverage beyond what the legislature has mandated, then that is a task for the legislature, not the board.

In connection with this assignment of error, the board has submitted the case of *In re Senders* (1996), 110 Ohio App.3d 199, 673 N.E.2d 959. In *Senders*, the court upheld a regulation of the board that conditioned fund eligibility (not initial coverage) on compliance with state fire marshal rules. Although *Senders* involved a different regulation from the present case and is distinguishable on that basis, the court's discussion does accept the principles now urged by the board to support a broad reading of its regulatory powers. In *Senders*, an owner of a tank did not properly close the tank after it had been abandoned, nor did he pay fees to participate in the fund. At the time the owner wished to remove the tank from the ground, he paid three years' back fees, including an increased fee to reduce his deductible from $50,000 to $10,000. Given that the cleanup fee was $42,549, the owner would have been able to avoid all but the deductible by only paying $600, if eligibility were allowed.

After the board denied coverage, the trial and appellate courts affirmed. Of particular relevance to the disposition was Ohio Adm.Code 3737–1–07, which set forth criteria for determining fund eligibility, and which, according to the *Senders* court, allowed the board to require "compliance with State Fire Marshal rules to validate a certificate of coverage." *Id.* at 205, 673 N.E.2d at 963. The court concluded that it would be inconsistent to allow owners and operators to disregard underground storage tank regulations and yet collect money for petroleum releases they could have avoided by adhering to regulations. We disagree, as these conclusions are not supported by the statute.

At no point in the *Senders* opinion does the court refer to R.C. 3737.92(D)(3), which contains the pertinent reference to "compliance" as a condition for fund

---

**2.** As an aside, we note that the board's argument about necessary jurisdictional information is additionally cast into doubt by the fact that the board apparently has access to and can cross-reference lists of underground storage tanks registered with the state fire marshal's office. *Kirwen v. Petroleum Underground Storage Tank Release Comp. Bd.* (1994), 95 Ohio App.3d 323, 326, 642 N.E.2d 432, 434.

eligibility. Under R.C. 3737(D)(3), eligibility is not dependent on compliance with state fire marshal *regulations*. Rather, eligibility is predicated, among other things, on a determination by the fire marshal that "when the claim was filed, a responsible person was in compliance with all *orders* issued under sections 3737.88 and 3737.882 of the Revised Code regarding the underground petroleum storage tank from which the release occurred." (Emphasis added.) R.C. 3737.92(D)(3). In this regard, we note that "orders" are not the same as "regulations," in that a regulation would have uniform and general application, while an order would be directed at a specific person or entity. *State ex rel. Fisher v. Nacelle Land & Mgt. Corp.* (1993), 90 Ohio App.3d 93, 97, 628 N.E.2d 67, 69; and R.C. 119.01.

Reference to R.C. 3737.88 and 3737.882 supports this point. For example, R.C. 3737.88(A)(1) gives the fire marshal power to adopt rules to implement the underground storage tank program, as well as the power to issue "citations and orders to enforce those rules." Likewise, R.C. 3737.882 gives the fire marshal the power to issue "citations and orders" for cleanup. A prerequisite for fund eligibility, then, is that a responsible person not be in violation of orders issued either to enforce fire marshal rules or to require cleanup.

Although the *Senders* court did not discuss subsection (D)(3), it did focus on (D)(1), which conditions fund eligibility on possession, at the time the release is suspected or confirmed, of a valid certificate of coverage issued by the board. The statute does not define "valid certificate," and the board's position in *Senders* was that Ohio Adm.Code 3737–1–07 supplied the missing definition by requiring compliance with fire marshal rules in order to obtain a valid certificate of coverage. *Id.*, 110 Ohio App.3d at 205–206, 673 N.E.2d at 963–964. This is similar to the position of the board in connection with the third assignment or error in the current litigation. In that assignment of error, the board claims that the issuance of a certificate of coverage is properly based on a requirement that applicants certify that they are complying with fire marshal regulations. To hold otherwise, the board suggests, would conflict with the statutory purpose of the legislation and improperly allow persons responsible for leaks to receive compensation from the fund.

The court in *Senders* accepted the board's interpretation, finding that to hold otherwise would impermissibly allow the doctrine of estoppel to be applied against the state. Specifically, the court stated:

"Under the appellant's argument, an owner of [a] UST who allows an improperly abandoned tank to leak into the environment could not be denied Fund eligibility in the absence of a notice of violation from the fire marshal.

"* * * It would be an inconsistent and unreasonable result if tank owners and operators could disregard Ohio UST regulations, and in doing so, collect money

from the Fund for a petroleum release which could have been prevented by following the procedures." *Id.,* 110 Ohio App.3d at 205–206, 673 N.E.2d at 963–964.

While we might agree philosophically with this concept, we do not find estoppel applicable, nor are we free to engraft our own interpretation on a clear statute. In *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 146, 555 N.E.2d 630, 633, the Supreme Court refused to apply estoppel to prevent the State Pharmacy Board from revoking the license of a pharmacist when the board had renewed his license for several years, knowing he was under criminal investigation. In noting the general rule against applying estoppel to the exercise of governmental functions, the court stated that "[i]f a government agency is not permitted to enforce the law because the conduct of its agents gives rise to an estoppel, the interest of all citizens in obedience to the rule of law is undermined." *Id.*

This, however, is not the effect in the current case, nor do we believe it was the result in *Senders,* because the legislature's direction as to fund coverage and eligibility is not ambiguous. Therefore, adherence to the legislature's mandate does not prevent either the fire marshal or the board from carrying out a lawful function. In this context, we note the Supreme Court's admonition in *Frantz* that the intent of a statute must be determined from the language, and if the intent is clearly expressed, "the statute may not be enlarged or abridged." 51 Ohio St.3d at 145, 555 N.E.2d at 632. In addition, an unambiguous statute is "not subject to judicial modification under the guise of interpretation." *Id.*

In this vein, R.C. 3737.91 and R.C. 3737.92 provide a two-step procedure *vis-a-vis* the fund. First, application is made for a certificate of coverage, and as noted above, the only conditions placed on that process are the payment of a fee and the demonstration of financial responsibility in compliance with the rules of the fire marshal on financial responsibility. Next, once corrective action costs for an accidental release of petroleum have been incurred, a responsible person makes a claim for reimbursement from the fund. In that event, R.C. 3737.91 sets forth a number of conditions for eligibility. After examining these conditions, we find no ambiguity.

First, because the legislature distinguished between "orders" and "regulations," we must assume that the legislature would have included compliance with regulations in R.C. 3737.92(D) if it intended that type of compliance to be a prerequisite for fund eligibility. Instead, the legislature only specified compliance with orders as a requirement. Moreover, a review of the other requirements indicates a liberal attitude toward eligibility. For example, the only other provision dealing with fault is R.C. 3737.92(D)(5), which predicates eligibility on the absence of falsification in the registration application made to the state fire

marshal. Likewise, R.C. 3737.92(D)(2) allows reimbursement even where tanks are not registered if the fire marshal recommends it and back fees are paid. Again, the legislature would have been aware that tank owners could be negligent or noncompliant with regulations of the fire marshal, but chose not to include such factors as prerequisites for fund eligibility.

We also find no inconsistency between this interpretation and the statutory scheme. While R.C. 3737.948 indicates that the powers granted under R.C. 3737.90 through 3737.948 are to be exercised on behalf of the people of this state and their health and welfare, the provision of an insurance fund for cleanup of accidental releases of petroleum is consistent with that purpose, as well as the federal statutes on the subject. That the fund operates to insure against even negligent or noncompliant conduct is no more against public policy than the existence of automobile insurance, which limits the financial exposure of drivers who negligently injure others. By this, we do not imply that negligent conduct is to be condoned. However, the fund, like insurance, operates to the benefit of the public by ensuring that adequate funds are available to protect the public through cleanup and through compensation for third-party bodily injury and property damage.

In this context, we note that the Ohio Supreme Court, in discussing whether the fund assessments were a tax or fee, recognized that the statutory purpose of the plan was to protect state water resources and reduce pollution by creating a fund to reimburse owners and operators for costs of corrective plans and to compensate third persons for injury. *State ex rel. Petroleum Underground Storage Tank Release Comp. Bd. v. Withrow* (1991), 62 Ohio St.3d 111, 579 N.E.2d 705. The court also observed:

"Leaking USTs present a major environmental hazard and are recognized as a common cause of groundwater pollution in Ohio. When the United States Environmental Protection Agency ('EPA') promulgated regulations requiring owners and operators of USTs to demonstrate financial responsibility, pursuant to Section 6991b(c)(6) and (d), Title 42, U.S.Code, *the EPA gave the individual states the opportunity to aid UST owners and operators in satisfying that requirement.*" [3] (Emphasis added.) 62 Ohio St.3d at 112, 579 N.E.2d at 706.

The court then noted that the provisions in the Revised Code establishing the fund represented "the Ohio Legislature's effort to assist owners and operators in

---

3. The aid referred to by the Supreme Court is authorized by Sections 280.100 and 280.101, Title 40, C.F.R., which allow the use of state assurance funds to satisfy the financial responsibility required of an owner or operator under the federal statutes. Neither the federal statute nor the regulations promulgated thereunder require freedom from negligence for participation in such a fund.

demonstrating financial responsibility." *Id.* Finally, the court likened the fund to insurance, stating as follows:

"While the Assurance Fund plan does not possess all the attributes of an insurance program, it sufficiently resembles one in that a form of protection in return for a fee appears to exist." 62 Ohio St.3d at 117, 579 N.E.2d at 709. See, also, *Kirwen v. Petroleum Underground Storage Tank Release Comp. Bd.* (1994), 95 Ohio App.3d 323, 324, 642 N.E.2d 432, 433 (stating that purpose of R.C. 3737.90 through 3737.99 was to provide insurance coverage for the costs of corrective action and third-party compensation).

In light of the above analysis, we must disagree with the decision in *Senders.* Presumably, the legislature meant what it clearly said, and if additional criteria are to be imposed as a condition for coverage and eligibility, that is for the legislature to say, not courts or administrative agencies. And, as a final matter, we do not find the use of the term "valid certificate of coverage" a grant of authority to the board to condition issuance of coverage on compliance with regulations of the fire marshal, other than the one pertaining to financial responsibility. Again, had the legislature intended to expand the requirements for issuance of a certificate of coverage, it would have clearly said so. In addition, R.C. 3737.91(D)(1)(b) itself provides a means by which a certificate of coverage can become invalid, by providing that an issued certificate is "subject to the condition that the holder timely pay any supplemental fee assessed" by the board. Consequently, we interpret the requirement in R.C. 3737.92(D)(1) that a responsible person possess a valid certificate of coverage as simply mandating, as a preliminary matter, that an applicant have a certificate of coverage issued by the board for the pertinent time period and that the certificate not have become invalid thereafter based on failure to pay supplemental fees assessed by the board.

Accordingly, in view of the preceding discussion, the second assignment of error is overruled.

### III

The third assignment of error is similar to the second, and involves questions three, four, five, seven, eight, and nine on the certification of assurability. These questions ask if the applicant is in compliance with various state fire marshal rules. For example, question five asks if the tanks are being monitored for releases as required by the fire marshal. In this regard, Ohio Adm.Code 1301:7–9–07 contains general leak detection requirements for all UST systems and specifically requires monitoring at certain intervals for petroleum UST systems. Records are also to be kept of the results of monitoring.

As was noted above, the board's argument in connection with this assignment of error is that it has authority to require disclosure of information and to deny certificates of coverage to persons who will not certify that their tanks are in compliance with fire marshal regulations. Based on our previous discussion of this point, we reject the board's argument. No matter how admirable the board's motives, the board cannot add to the powers delegated to it by the legislature. *Carroll,* 10 Ohio App.3d at 110, 10 OBR at 133, 460 N.E.2d at 707. While R.C. 3737.90(B)(2) gives the board the ability to adopt rules to implement and administer the Financial Assurance Fund, the board cannot add to the requirements explicitly set forth by the legislature. Consequently, the third assignment of error is without merit and is also overruled.

## IV

The final assignment of error raises the point that if only part of a rule is held invalid, the remainder of the rule must be given effect. Since we have rejected the board's argument that certain of the criteria for assurability in Ohio Adm. Code 3737–1–04(E)(3) and (4) are valid exercises of the board's power, this assignment of error is moot. The trial court's determination was that the board does not have the authority to impose the criteria in Ohio Adm.Code 3737–1–04(E)(3) and (4) as preconditions for coverage, and we affirm that decision. As a result, the judgment of the trial court ordering the board to issue the requested certificates to Franklin Iron is affirmed.

*Judgment affirmed.*

WOLFF, J., concurs.

GRADY, J., dissents.

GRADY, Judge, dissenting.

The Ohio Petroleum Underground Storage Tank Release Compensation Board ("USTB") is authorized by R.C. 3937.90(B)(2) to "adopt, amend, and rescind such * * * rules as are necessary or appropriate to implement and administer sections 3737.90 to 3737.98 of the Revised Code."

R.C. 3737.91(B) requires the USTB to establish an annual fee to be paid for each tank comprising an underground storage tank and further provides:

"The amount of the annual fee due in 1989 and 1990 is one hundred fifty dollars per tank per year. In 1991 and subsequent years the board shall establish the amount of the annual fee in accordance with this division. *Not later than the first day of April of 1991 and each subsequent year, the board, in consultation with*

*the administrative agent of the fund with whom the board has entered into a contract under division (B)(3) of section 3737.90 of the Revised Code, if any, shall determine the amount of the annual fee to be assessed in that year and shall adopt rules in accordance with Chapter 119 of the Revised Code to establish the fee at that amount. The fee shall be established at an amount calculated to maintain the continued financial soundness of the fund,* provided that if the unobligated balance of the fund exceeds forty-five million dollars on the date that an annual determination is made, the board may assess a fee in the year to which the determination applies only to the extent required in or by, or necessary to comply with covenants or other requirements in, revenue bonds issued under section 3737.90 to 3737.948 of the Revised Code or in proceedings or other covenants or agreements related to such bonds." (Emphasis added.)

Paragraph (C) of the same section requires the USTB to assess a supplemental fee "as necessary to maintain the *financial soundness* of the fund * * * in any fiscal year in which the board finds that the unobligated balance in the fund is less than fifteen million dollars." (Emphasis added.) Paragraph (E)(2) requires the USTB to establish a deductible amount for claims in "an amount as to maintain the *financial soundness* of the fund." (Emphasis added.)

I agree that the General Assembly's charge to the USTB does not authorize it to enforce environmental or safety regulations or to deny coverage to any responsible person who applies for it on account of those considerations, which are within the legislative charge of the state fire marshal. However, the General Assembly has made the USTB the fiscal agent of the fund, and in that connection has charged the USTB to establish an annual fee for coverage and to calculate the fee and related charges in amounts which the USTB determines are necessary to "maintain the continued financial soundness of the fund." Further, the USTB is specifically authorized to "adopt rules in accordance with Chapter 119 of the Revised Code" in order to do so. In my view, those provisions authorized the USTB to adopt Ohio Adm.Code 3737–04(E)(3), which requires the director to establish assurability criteria that are reasonably related to the USTB's statutory duties as fiscal agent. Therefore, I would hold that the USTB is not required to issue a certificate of coverage to any responsible person who has failed to satisfy the assurability criteria established by its director. That would, of course, include plaintiff-appellee, who has refused to submit the information necessary for compliance.

I would reverse the judgment from which the appeal is taken and vacate the order of the trial court requiring the USTB to issue a certificate of coverage to plaintiff-appellee.